IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| JERRY GREGORY, | ) | |
| Plaintiff | ) | |
| v. | ) | No. 4:04-cv-24 |
| GOODMAN HEATING AND COOLING, | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION**

This is an action brought under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq., under the Age Discrimination in Employment Act, 29 U.S.C. §§ 622 et seq., and under the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-311 et seq.. Plaintiff claims that he was discharged from employment at Goodman Heating and Cooling on grounds of age and race discrimination. Plaintiff also claims that while employed by Goodman Heating and Cooling, he was adversely treated on grounds of age and race discrimination. Currently pending is defendant's motion for summary judgment [Court Document 22-1].

I.

*Factual Background*

The following factual allegations are considered in the light most favorable to the plaintiff.

1

Plaintiff Jerry Gregory is an African-American male who was employed at the Goodman Heating and Cooling Plant in Fayetteville, Tennessee since 1998 when Goodman Heating and Cooling acquired the plant from Amana. He began work at the Amana plant in 1973 in the capacity of assembly line worker, and he was promoted to department supervisor in 1983. During the nearly 30 years that the plaintiff worked at the Goodman Heating and Cooling/Amana plant, he claims he received respect from fellow employees and was never accused of sexual misconduct. The plaintiff was 51 years old when terminated by the defendant in July 2003.

The plaintiff, the only African-American department supervisor at Goodman, claims he is paid a lower hourly wage than other similarly situated white supervisors. He was a department supervisor during the 2nd shift at the defendant's plant. He claims his workload often included responsibility for more departments than most other supervisors, and the plaintiff claims that on May 7, 1998, he was reprimanded for engaging in conduct in which other white supervisors engaged without reprimand.

The plaintiff became involved in a dispute when another Goodman Heating and Cooling employee, Lisa Newgent, accused the plaintiff of sexual harassment. At the time of the claim, Newgent had worked for Goodman for a little over one year and worked the 2nd shift under the supervision of the plaintiff. Before the sexual harassment accusations were made and acting in his capacity as supervisor, the plaintiff reported Newgent's absenteeism from work. The plaintiff claims that, in response to the plaintiff's negative

2

reports of her absenteeism, Newgent made comments to other employees that she wished to take adverse action against him.

The plaintiff also claims that among employees at Goodman Heating and Cooling, Newgent, a white female, was known as a drug addict who was often late or absent from work and who engaged in sexual misconduct at the workplace. Goodman employee, William J. Wilson, who worked the 2nd shift in the coil department under the supervision of the plaintiff and alongside Newgent, stated in an affidavit that Newgent was a known crack addict who would often leave work after getting paid on Thursdays and not return on Fridays. In affidavits, Zarte Fowler and Nashea Henderson, also stated that Newgent often left work after getting paid on Thursdays and often would not return for work on Fridays. Wilson claims that he observed Newgent in an apparently "altered state" at work on many days.

In July 2003, after searching his office for Newgent's paycheck and upon belief that she had stolen the paycheck, the plaintiff claims that he advised Newgent that her check was missing from his desk and that he was going to report the missing check to payroll. Nashea Henderson, a group leader of the department who worked under the supervision of the plaintiff, stated in an affidavit that she helped the plaintiff look for the lost paycheck in the plaintiff's office. When he later returned to his office, the plaintiff claims the missing check had been returned to his desk. The plaintiff did not report the missing check to payroll. Newgent disputes these facts and claims that on that day, the plaintiff told her that he was going to withhold her paycheck until Friday despite the fact that paychecks are

typically disbursed on Thursdays.

Newgent claims that during that same shift, she had a conversation with the plaintiff about acquiring paperwork for transferring from the 2nd shift to the 3rd shift. During this conversation, Newgent claims that the plaintiff told her that he would only give her the paperwork if she would have sex with him that Saturday night. As a department supervisor, the plaintiff claims he did not have authority to issue paperwork to an employee for a shift change. After the alleged sexual harassment, Newgent reported the conversation to Darlene Weir and then to Darlene Weir's husband, Darryl Weir. Darryl Weir, acting in his capacity as the union representative, reported the incident to Human Resources. Jimmy Camp, a Human Resources member, took Newgent's complaint of sexual harassment.

Vice President of Human Resources for the defendant's Fayetteville plant, Jim Phillips, learned about the complaint from Camp. After learning about the sexual harassment complaint, Phillips conducted an investigation of the sexual harassment accusations made by Newgent pertaining to the plaintiff.

Phillips interviewed and took a statement from Newgent on July 14, 2003. The statement contains allegations that the plaintiff told Newgent that he would only give her the necessary paperwork to transfer to the 3rd shift if she would have sex with him. The plaintiff contends that Goodman should have questioned Newgent's motives for making such accusations and ascertained the circumstances surrounding the accusations.

4

Specifically, the plaintiff claims that an investigation into the surrounding circumstances would have revealed that Newgent had been reported for absenteeism multiple times by the plaintiff and would have also revealed that sexual harassment complaints were never made against the plaintiff during his thirty years working at the plant.

During Phillips' interview with the plaintiff on July 14, 2003, Phillips advised him that Newgent accused the plaintiff of sexual harassment. The plaintiff claims that he asserted his innocence on the charges and advised Phillips of Newgent's threats to the plaintiff, known drug problems, and sexual misconduct at work. The plaintiff stated during his interview, Phillips did not ask him to present evidence or witnesses. Phillips ordered that the plaintiff refrain from discussing the matter with other employees while the investigation continued. After the interview, the plaintiff presented the defendant with a written statement denying any sexual harassment.

Phillips then conducted interviews with various employees who were asked to sign written statements. The plaintiff contends that Phillips and Telford used intimidation and coercion to obtain these statements in an attempt to justify discharging the plaintiff. Darryl Weir signed a written statement on July 14, 2003, but claims that contrary to the signed statement, he does not believe that the plaintiff sexually harassed Newgent. Nashea Henderson signed a written statement she claims is not factually correct, but she claims that she did not believe, at the time she signed the statement, that she could have refused to sign it. Phillips interviewed Zarte Fowler, a Goodman employee who worked under the

5

supervision of the plaintiff.  Fowler claims that during his interview, he maintained that he neither knew of any sexual harassment complaints made pertaining to the plaintiff nor believed that the plaintiff would harass employees.  Fowler contends that although he told Phillips and Telford that he was telling the truth, Telford became upset at Fowler for "taking up for [the plaintiff]," left the room, and slammed the door.

During the investigation of Newgent's sexual harassment accusation, Phillips and Terry Telford also interviewed Octavius Settles, another employee at the Goodman plant.  Settles claims in an affidavit that despite having no knowledge of the incident and accusations between the plaintiff and Newgent at the time of the interview, he made false statements about the plaintiff's conduct during the interview.  Settles claims that after he initially told Phillips and Telford that he was without knowledge of any harassment made by the plaintiff, Telford threatened to administer a drug test on Settles and hit the desk.  Settles claims that he was "so scared and intimidated" that he "would have told them [the plaintiff] raped her if they had asked me."  Settles' written statement, the product of the interview described above, states that the plaintiff spoke with Settles about the investigation and asked him not to say anything about the plaintiff's conduct.  The plaintiff contends that Telford used intimidation and the threat of a drug test to obtain a written statement from Settles that would justify terminating the plaintiff.

No one complained to Phillips about feeling threatened, intimidated or coerced during the interviews.

After the interviews on July 14, 2003 and based on Phillips' belief that the plaintiff discussed the sexual harassment accusation with other employees, Phillips called Nashea Henderson at home to ask her if she and the plaintiff discussed the matter. After Henderson assured Phillips that she had not talked to the plaintiff, Henderson claims that Phillips told her he did not believe her.

Philips claims that he is not aware of any circumstances at the defendant's Fayetteville plant in which an employee under investigation for a sexual harassment complaint may have discussed the matter with other employees.

The defendant discharged the plaintiff in July 2003. At that time, the plaintiff claims that he was two months away from being fully vested in full retirement and pension benefits for thirty years of work. The plaintiff believes that the defendant also terminated three other older, African-American employees from their jobs on grounds of race discrimination and hired white employee replacements.

After the plaintiff's termination from Goodman, Teresa Bolin, who worked under the supervision of the plaintiff, claims she asked Newgent if her sexual harassment accusations against the plaintiff were true, and Newgent responded that they were not. Newgent was terminated by the defendant shortly after the plaintiff's termination.

Since the plaintiff's termination from Goodman, the plaintiff claims that at least two

7

younger, white men were hired to replace his position as supervisor for multiple departments.

In an affidavit, the plaintiff claims that the defendant treated similarly-situated, younger, white male employees more favorably. Specifically, the plaintiff claims that four younger, white males in supervisory positions were accused of harassment in the workplace, but that none of them were terminated. The plaintiff claims that a younger, white department supervisor, Mike Northern, was accused of sexual harassment and caught downloading pornography during work hours but at the time of the plaintiff's termination, was still employed as department supervisor. Another younger, white department supervisor, Donnie Moorehead, was allegedly accused of sexual harassment without termination also. The plaintiff claims that two younger, white male department heads, Jackie Boyette and Jerry Warren, were accused of racial harassment, and one was accused of both racial and sexual harassment. The plaintiff claims that the defendant removed Boyette from his supervisory position but did not terminate him.

The plaintiff claims that the defendant, specifically Vice President of Human Resources, Jim Phillips, should be aware of the sexual harassment complaints made against Goodman supervisors Northern, Warren, and Boyette. And the plaintiff claims that Phillips should also be aware that these three employees were not terminated as a consequence of the complaints. Other than the general allegations of sexual and/or racial harassment described above, the specifics of these harassment complaints are not stated. Phillips claims that he knows of no sexual harassment claim in which a supervisor

8

attempted to coerce sex from another employee.

II.

*Summary Judgment Standards*

Persuant to Rule 56, summary judgment shall be granted when requested if no genuine issue of material fact exists as shown by the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, and the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of showing the court that by uncontradicted evidence, there exists no disputed, material fact pertaining to a genuine issue essential to the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Once the moving party has established a showing that no material fact exists, the non-moving party must present significant, probative evidence indicating a material, factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denial of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. However, the presentation of "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. Rule 56 mandates a granting of summary judgment against a party who fails to make an adequate showing sufficient to establish a disputed, material fact of an essential

9

element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

III.

### *Plaintiff's ADEA and Title VII Claims*

The plaintiff's complaint essentially raises two separate claims. First, that in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 622 et seq., and/or Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., he was discriminated against on the basis of his age and/or race when he was paid less and given a larger workload than younger and/or white supervisors with similar jobs. Second, that in violation of the ADEA and/or Title VII he was discriminated against on the basis of age and/or race when his employment was terminated.[1]

Employment cases under both Title VII and the ADEA are both analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Bush v. Dictophone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998); *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 800 (6th Cir. 1998). Under *McDonnell Douglas*, the plaintiff must prove a prima facie case by showing: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) circumstances support an inference of discrimination. *McDonnell,* 411 U.S. at 802;

---

[1] Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-311 et seq., claims are similarly analyzed and mirror the federal standards, so the analysis herein applies with equal force to the claim. *Anderson v. Mead Johnson Nutritional Group, Bristol-Myers Squibb Co.*, 910 F. Supp. 376, 380 (E.D. Tenn. 1996).

10

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). In some termination of employment cases, the fourth factor is shown by demonstrating that the plaintiff was replaced by someone outside the protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). In other termination cases, this fourth element is sometimes met by showing that similarly-situated employees outside the protected class were treated differently and not terminated for engaging in the same or similar conduct. *Id.* at 582-83.

Once a plaintiff demonstrates a prima facie claim, the burden shifts to the defendant who may produce evidence of a legitimate, non-discriminatory reason for its actions. *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 374 (6th Cir. 1984). If the defendant meets that burden of producing evidence of a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to show that these reasons are pretextual and not the true reason for the defendant's actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1973). The plaintiff may meet this burden of persuasion by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 255. If the plaintiff attempts to show that the defendant's legitimate, non-discriminatory reasons for adverse action are "unworthy of credence," the plaintiff must show by a preponderance of the evidence either (1) that the proferred reasons had no basis in fact; (2) that the proferred reasons did not actually motivate his discharge; or (3) that they were insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The plaintiff's burden requires a showing of pretext plus the presentation of a prima facie claim showing intentional discrimination. *St. Mary's*

11

*Honor Center v. Hicks*, 509 U.S. 502, 517 (1993).

IV.

***Plaintiff's Claims for Pay and Hours***

The federal courts only have subject matter jurisdiction over employment discrimination claims when a claimant has exhausted administrative remedies. *Love v. Pullman Co.*, 404 U.S. 522 (1972). In order to exhaust administrative remedies under Title VII and ADEA claims, the plaintiff must first file an EEOC charge. *EEOC v. Bailey Co. Inc.*, 563 F.2d 439, 446 (6th Cir. 1977), *cert. denied*, 435 U.S. 915 (1978); *Vinson v. Ford Motor Co.*, 806 F.2d 686, 688 (6th Cir. 1986), *cert. denied*, 482 U.S. 906 (1987). The purpose of the EEOC charge is to prompt an investigation and to give notice to the defendant of the possibility of litigation. *Dixon v. Ashcroft*, 392 F.3d 212 (6th Cir. 2004). The EEOC charge must either explicitly state the claim or state a charge from which the claim can be reasonably expected to grow. *Strouss v. Mich. Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001). Because the plaintiff's claims of lower hourly wage and greater workload cannot be expected to grow out of a wrongful termination claim, this court does not have subject matter jurisdiction over these two claims, and the claims will be dismissed.

Even if the court had subject matter jurisdiction over the claims, the plaintiff has not presented an actionable claim with regard to either the lower hourly wage or the greater workload claims.

The plaintiff has not presented a prima facie claim under Title VII or the ADEA with regard to his hourly wage or his workload because he has not met the third *McDonnell Douglas* test requirement of showing that he suffered an adverse employment action. The plaintiff claims that he was paid a lower hourly wage than younger and/or white similarly-situated department supervisors at defendant's Fayetteville plant, but he has not offered evidence to the court of a discrepancy between the hourly wages paid to the plaintiff and those of other comparable employees. Therefore, without evidence that the plaintiff's compensation was less than that of comparables, the plaintiff has not presented an actionable claim under Title VII or ADEA for less compensation based on age or race.

The plaintiff also claims that his workload was greater than that of younger and/or white department supervisors, but his claim fails to meet the prima facie case requirement that he suffered a "materially adverse" employment action. *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002). To be considered "materially adverse," the defendant's employment action "must be more disruptive than a mere inconvenience." *Id.* at 553. The court considers "materially adverse" actions to include the termination of employment, a demotion by decrease in wage or salary, a less-distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indications unique to a particular situation. *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). Employment actions considered "materially adverse" by the Sixth Circuit typically consist of actions that diminish the plaintiff's responsibilities, not increase them. *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996) (stating that without proof of diminished hourly wage or hourly work changes, plaintiff did not persuade the court of the

13

existence of a materially adverse employment action); *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir. 1996) (noting that plaintiff's pay or benefits had not been reduced).

The defendant's actions of giving the plaintiff more responsibility or more departments to supervise tend to show a greater reliance on the plaintiff's work ability and not to show a "materially adverse" employment action. The plaintiff has not claimed that he was incapable of handling the responsibility of supervising more departments, and his many years of work experience at the defendant's plant tend to persuade the court that additional supervisory responsibilities were the natural outcome of the plaintiff's ability to handle such responsibilities. Therefore, the court does not find that the plaintiff's additional department supervisory responsibilities constitute a "materially adverse" employment action for Title VII or ADEA claim purposes.

V.

*Plaintiff's Claims for Termination*

The plaintiff claims that, in violation of the ADEA and/or Title VII, his termination by the defendant was because of his age and/or race. In order to present a prima facie claim under *McDonnell Douglas*, the plaintiff must show that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) circumstances support an inference of discrimination. *McDonnell,* 411 U.S. at 802.

The plaintiff meets all four requirements of the *McDonnell Douglas* test and,

14

therefore, establishes a prima facie claim for discriminatory termination based on age and race. The plaintiff is a 51-year-old, African-American male, and a member of both classes protected by Title VII and the ADEA. Evidence suggests that the plaintiff was performing his job satisfactorily at the time of his termination. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie state of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as a reason for terminating the plaintiff."). The defendant's termination of the plaintiff constitutes an adverse employment action. *Hollins,* 188 F.3d at 662.

The fourth requirement of the *McDonnell Douglas* test may be met by showing that the defendant's treatment of the plaintiff differed from treatment of similarly-situated individuals. *Suggs v. ServiceMaster Educ. Food Management*, 72 F.3d 1228, 1232 (6th Circuit 1996). In this case, younger, white supervisors at the defendant's Fayetteville plant may not have been terminated or investigated when accused of sexual harassment or sexual misconduct. The court is persuaded that a disputed, material fact exists regarding whether the defendant treated accusations of sexual harassment made against younger, white supervisors more favorably than it treated accusations made against the plaintiff. The court is also persuaded that a jury should determine whether the defendant believed that the plaintiff attempted to interfere with the investigation because this material fact remains disputed as well. Because a jury could infer from the evidence that the defendant's investigation of the accusations was not conducted in a reasonable manner,

15

a disputed, material fact exists regarding whether at the time of the plaintiff's termination, the defendant reasonably believed that the plaintiff interfered with the investigation. In all the necessary aspects, the plaintiff has presented sufficient evidence showing that similarly-situated employees were treated more favorably and raising an inference of discrimination.

In *Cline v. Catholic Diocese of Toledo*, the Sixth Circuit Court of Appeals stated that the prima facie evidentiary requirements, although divided into intermediate stages by the *McDonnell Douglas* burden shifting analysis, "simply serve to 'bring the litigants and the court expeditiously and fairly to the ultimate question.'" *Cline*, 206 F.3d at 660 (quoting *Burdine*, 450 U.S. at 253). At all times, the ultimate question remains whether the employer intentionally discriminated against the employee. *Burdine*, 450 U.S. at 253. Thus, the shifting burden of production and stages of evidentiary disclosure in the *McDonnell Douglas* test establishes a framework in which the fact-finder may sharpen its inquiry into whether intentional discrimination occurred.

After the establishment of a prima facie claim, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the plaintiff's termination. *Jackson*, 743 F.2d at 374. The defendant has met this burden by stating that at the time of the plaintiff's termination, it believed the plaintiff had engaged in sexual misconduct in the workplace and interfered with the investigation into the accusations of sexual misconduct made against him. Specifically, the defendant's Vice President of Human Resources, Jim Phillips, claims he believed the plaintiff had sexually harassed another employee, Lisa

16

Newgent, by making sexually explicit comments to her and by attempting to coerce sex from her. During the investigation, Phillips obtained written statements from employees that the plaintiff had made sexually explicit comments to Newgent in the workplace. Based on statements made by one employee, the defendant also claims it believed the plaintiff had attempted to interfere with the investigation into the accusations.

After the defendant shows a legitimate, non-discriminatory reason for termination, the burden returns to the plaintiff to show that the defendant's stated reasons are pretextual, which may be done "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 253. The Sixth Circuit clarified this stage of the burden-shifting analysis stating:

> [T]he only effect of the employer's nondiscriminatory explanation is to convert the inference of discrimination based on the plaintiff's prima facie case from a mandatory one which the jury *must* draw, to a permissive one the jury *may* draw, *provided* that the jury finds the employer's explanation "unworthy" of belief. The jury may not reject the employer's explanation, however, unless there is a sufficient basis *in the evidence* for doing so.

*Manzer*, 29 F.3d at 1083.

The plaintiff may indirectly show that the defendant's proffered reasons are pretextual by presenting evidence "that they were insufficient to motivate discharge." *Manzer*, 29 F.3d at 1084. When demonstrating that the proffered reasons for termination were insufficient, no further evidence of discrimination is required and "the court is permitted to infer discrimination from the circumstances." *Kline*, 128 F.3d at 346. At this stage in the burden-shifting analysis, the plaintiff may present evidence which casts doubt

17

on the defendant's proffered reasons for discharge. *See Gray v. Toshiba Am. Consumer Prod.*, 263 F.3d 595 (6th Cir. 2001) (noting that the plaintiff's lack of a prima facie claim and inability to cast doubt on the credibility of the employer's legitimate reason for termination required dismissal in favor of the employer). In this case, circumstances suggest the defendant may have threatened or intimidated employees in order to obtain false statements during the investigation and did not terminate other similarly-situated employees for similar conduct. With regard to the plaintiff's age discrimination claim, the court finds the fact that the plaintiff was two months shy of vesting for full retirement benefits a significant inference of age discrimination when combined with the other evidence presented. The sum of this evidence casts doubt on the defendant's proffered reasons for discharging the plaintiff and creates a genuine issue of disputed, material fact such that a reasonable fact-finder could determine that the defendant's real reason for termination of the plaintiff was intentional discrimination based on age and/or race.

The plaintiff presented evidence of a prima facie claim for discriminatory termination under Title VII and the ADEA, and the plaintiff also presented sufficient evidence such that a reasonable jury could find the defendant's proffered reasons for discharging the plaintiff were pretextual. Because a genuine issue of disputed, material fact exists regarding whether the defendant's proffered reasons for terminating the plaintiff are pretextual, summary judgement on this issue will not be granted.

## VI.

### *Conclusion*

Based on the foregoing, the court concludes that the plaintiff's claims of discrimination regarding lower hourly wage and heavier workload are dismissed for lack of subject matter jurisdiction. Even if subject matter jurisdiction were proper, the plaintiff fails to present sufficient evidence for either claim. With respect to the plaintiff's claim for discriminatory termination under Title VII and the ADEA, the court declines to grant summary judgment for the defendant because a genuine issue of material fact exists with regard to the plaintiff's claim.

Order accordingly.

*s/ James H. Jarvis*
U.S. DISTRICT JUDGE
